JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
FILED

APR 24 1980

PATRICIA D. HOWARD
CLERK OF THE PANEL

4/24/80

BEFORE THE JUDICIAL PANEL
ON
MULTIDISTRICT LITIGATION

IN RE ECUADORIAN OIL CONCESSION    )    DOCKET NO. 424
LITIGATION                          )

OPINION AND ORDER

BEFORE ANDREW A. CAFFREY,* CHAIRMAN, AND ROY W. HARPER,
CHARLES R. WEINER, EDWARD S. NORTHROP, ROBERT H. SCHNACKE,
FREDERICK A. DAUGHERTY,* AND SAM C. POINTER, JR., JUDGES
OF THE PANEL.

PER CURIAM

This litigation consists of one action pending in

the District of Delaware and one action pending in the

Southern District of Florida.  Texaco, Inc. (Texaco); its

subsidiary, Texaco Petroleum Company (Texaco Ecuador);

Gulf Oil Corporation (Gulf); and its subsidiary, Ecuadorian

Gulf Oil Company (Gulf Ecuador) are the same four defendants

named in both actions.  Phoenix Canada Oil Company Limited

(Phoenix) is the plaintiff in the Delaware action, and

Norsul Oil and Mining Company, Ltd. (Norsul) is the plaintiff

in the Florida action.

The Delaware action was brought by Phoenix in November,

1976.  The Honorable Murray M. Schwartz, to whom the Delaware

action has been assigned, has described the background

and allegations of the complaint in the Delaware action

as follows:

---

* Judges Caffrey and Daugherty took no part in the decision
of this matter.

In 1961, Minas Y Petroleos del Ecuador ("Minas"), a wholly owned subsidiary of [Norsul], obtained a concession contract from the government of Ecuador for the exploration, development, and marketing of petroleum and natural gas deposits in Oriente Province, [the easternmost province in Ecuador, mountainous in nature and located about 300 miles from the shore]. Minas agreed to pay a royalty on each barrel of oil produced, to make substantial investments for development of the concession area, and to construct a pipeline and other facilities.  Subsequently, Minas realized that it could not fulfill the financial and exploration requirements of the 1961 concession contract.  As a consequence, in 1963 Norsul entered into an agreement with [Phoenix] under which [Phoenix] acquired a fifty percent interest in Minas in exchange for providing technical assistance and funds to defray preliminary exploration and maintenance costs.

In 1965, with the subsequent approval of the government of Ecuador, Minas on behalf of [Phoenix] and Norsul entered into a written agreement with the Ecuadorian operating subsidiaries of defendants Texaco and Gulf, the predecessors of defendants [Texaco Ecuador] and [Gulf Ecuador].  The subsidiaries were assigned the rights to develop a portion comprising approximately fifteen percent of the concession area in sole exchange for the assignor ("Minas") reserving a two percent gross royalty interest in crude oil production from the assigned area.

Early in 1969, defendants publicly announced their first oil discovery in the concession area. Ensuing reports within trade circles indicated that the amount of reserves within the concession area were very substantial.

The information heretofore related does not appear to be seriously disputed by the parties.  From this point onward, however, the parties' versions are at variance.  For purposes of evaluation, the succeeding account is derived largely from the Complaint.  [Phoenix] claims defendants committed acts and omissions giving rise to three legal theories of recovery:  (1) breach of contract; (2) unjust enrichment; and (3) intentional infliction of economic distress.  As related by [Phoenix], the facts justifying legal recovery on these grounds are as follows.

Defendants are alleged to have starting in 1969 and continuing to the present "agreed upon, developed and implemented plans, schemes and a conspiracy to eliminate or impair [Phoenix's] gross royalty interest, to destroy [Phoenix] as a going concern, to remove [Phoenix] as a competitor in Ecuador and elsewhere

and to reap whatever financial benefits would flow therefrom ...."  The alleged objective of defendants was either to reduce or eliminate the royalty interest or to enable the conversion by the Ecuadorian government of the royalty interest into taxes which could be credited on United States income tax returns.

Proceeding roughly in chronological order, [Phoenix] first avers defendants falsely and misleadingly claimed a discovery well was not located in the concession area and not subject to the two percent royalty. This matter was resolved after Norsul instituted a declaratory judgment action in federal court in New York by stipulation that the well was within the assigned area and Minas and its successors and assigns were entitled to a two percent royalty.  [Phoenix] claims the publicity surrounding the incident caused it harm in the financial market.

In 1971, [Phoenix] and Norsul each obtained an individual one percent royalty interest from Minas. [Phoenix] avers that defendants subsequently, for the purpose of harassing and financially and physically wearing down [Phoenix's] and Norsul's resources, began to request documents purportedly to establish right and title to the gross royalty.  [Phoenix] asserts that providing the "unnecessary documents" and attending meetings caused harm and that defendants were at all times fully aware of the validity of the royalty.

In 1972, a military government obtained power in Ecuador, replacing an elected civilian administration. Allegedly, at this point defendants falsely and mali- ciously began to publicly attack the original 1961 Minas concession agreement, terming it "piratical." Later in 1972, defendants commenced royalty payments to the government of Ecuador based on a new "reference price" which was set pursuant to a Hydrocarbons Law established by Ecuador in October 1971.  [Phoenix] claims at that time it was entitled to receive its gross royalty payment for the third quarter of 1972, as well as an accounting statement, but that neither was received when due.  Thereafter, a series of delays and extensions was allegedly forced upon [Phoenix] under "implied threat."  Meetings were held and further delays were requested with respect to subsequent payments. Some delays were granted, but in at least one case [Phoenix] asserts it agreed to no delay.  In early 1973, a new agreement was made, defendants allegedly having "extracted [Phoenix's] consent to the ... agreement and to repeated payment delays by economic duress."

Allegedly, soon after the 1973 agreement, "substan- tially all of defendants' senior officials and employees charged with defendants' Ecuador affairs traveled

to Quito, Ecuador to make further plans for the impairment
of [Phoenix's] gross royalty interest and the destruction
of said interest and therewith of [Phoenix's] business.
During this period, defendants continued to fail and
refuse to make any gross royalty payments to [Phoenix]."

On February 26, 1973, [Phoenix] states it was
advised by a Texaco official that gross royalty payments
would be withheld until "further notice."  The ensuing
publicity allegedly harmed [Phoenix] in the business
community.  Thereafter, on May 29, 1973, the Ecuadorian
government issued a decree imposing a retroactive
86% withholding tax exclusively on [Phoenix's] and
[Norsul's] royalty interest.  [Phoenix] claims that
it was harmed by defendants because even though this
tax would have reduced the amount of its royalty interest
after 1972, it was deprived of the carrying value
of the money it would have received if defendants
had paid the royalty properly.  [Phoenix] further
declares its other investments in other countries
were impaired due to the destruction in financial
credibility and capability defendant allegedly caused.

In August 1973, a contract was formed between
the Ecuadorian government oil company ("CEPE") and
defendants Texaco Ecuador and Gulf Ecuador.  The contract
granted CEPE the option to acquire up to twenty-five
percent of these defendants' oil production rights
in exchange for a negotiated consideration.  The option
was exercised by CEPE in June 1974.  Despite demands
by [Phoenix], defendants since that time allegedly
refuse to pay plaintiff a share of the funds derived
from the sale to CEPE.  Finally, [Phoenix] declares
that subsequent to 1973, "defendants have threatened
plaintiff that they intended not to make any further
gross royalty payments nor to furnish further accounting
statements."

Although the above is not complete, the account
fairly reflects [Phoenix's] allegations.  In sum,
[Phoenix] urges the 1965 agreement was breached by
failure and refusal to make timely payments, make
full payments, deposit the payments in the proper
place, and render proper accounting statements.  The
unjust enrichment claim is predicated on [Phoenix's]
failure to receive a royalty or share of the monies
garnered by defendants from the CEPE twenty-five percent
acquisition.  Finally, the theory of intentional in-
fliction of economic distress is asserted as a catchall
label for the alleged tortious acts of defendants
relating to the supposed embarkation on an alleged
plan to weaken or destroy [Phoenix] in order to reduce
or eliminate the royalty burden.

Phoenix Canada Oil Company Limited v. Texaco, Inc., et al., C. A. No. 76-421, slip op. at 9-16 (D. Del. April 10, 1978) (opinion denying motion to stay proceedings and motion to dismiss proceedings) (footnotes omitted).

In November, 1978, Phoenix amended its complaint to allege that in May, 1977, Gulf Ecuador transferred all its Ecuadorian interests to CEPE for approximately $117,500,000 and that Gulf Ecuador has failed to pay Phoenix from those proceeds the $14,500,000 royalty interest due Phoenix on the sale. Discovery has been ongoing in the Delaware action, and Judge Schwartz has established a June 30, 1980 discovery cutoff.

The Florida action was filed by Norsul on October 22, 1976. The allegations of the complaint generally track those of the complaint in the Delaware action except that the former contains no claims that the defendants conspired to weaken or destroy Norsul. Discovery is ongoing in the Florida action, but no discovery cutoff has been established.

This matter is before the Panel on the motion, pursuant to 28 U.S.C. §1407, of the four defendants in both actions for centralization of the two actions in either the District of Delaware or the Southern District of Florida for coordinated or consolidated pretrial proceedings. Phoenix and Norsul oppose transfer.

We find that, although these actions involve common questions of fact, transfer under Section 1407 would not necessarily serve the convenience of the parties and witnesses or promote the just and efficient conduct of the litigation.

Accordingly, we deny the motion to transfer.

Movants argue that centralization of the two actions in this litigation is necessary because 1) the actions are virtually identical and involve the same fundamental breach of contract assertion of two plaintiffs who claim precisely the same contractual relationship with the same four defendants, 2) absent coordinated or consolidated pretrial proceedings, burdensome and duplicative deposition discovery will occur, and 3) defendants have exhausted voluntary alternatives for securing coordination before resorting to Section 1407.

We find these arguments unpersuasive.  The Delaware action and the Florida action have each been pending for almost three and one half years.  All parties represent that extensive document discovery is virtually complete in both actions; and a June 30, 1980 discovery cutoff has been established in the Delaware action.  Under these circum-stances, centralization of the Florida and Delaware actions could delay the termination of the Delaware action without producing any overriding benefits. See In re Insulin Manu-facturing Antitrust Litigation, ___ F. Supp. ____, ___ (J.P.M.L., filed April 10, 1980) (slip op. at 5).

Moreover, only two actions are involved here.  Although we recognize the existence of common questions of fact between these two actions, movants have not met their burden

of showing that the remaining common factual questions
are sufficiently complex and that the remaining accompanying
discovery will be so time-consuming as to justify transfer
under Section 1407.  See In re Scotch Whiskey Antitrust
Litigation, 299 F. Supp. 543, 544 (J.P.M.L. 1969).

Finally, we note that suitable alternatives to Section
1407 transfer are still available to the parties in this
litigation.  Even in the absence of agreement by the parties,
any party could seek to make discovery completed in the
Delaware action applicable to the Florida action by requesting
the Florida court to order all parties to show cause why
that discovery should not be made applicable.  See In re
Penitentiary Postal Procedure Litigation, 465 F. Supp.
1293, 1294 (J.P.M.L. 1979).  Also, notices for any future
depositions could be filed in both actions, thereby making
the depositions applicable in both actions.  See In re
Oklahoma Insurance Holding Company Act Litigation, 464
F. Supp. 961, 965-66 (J.P.M.L. 1979).  See also Manual
for Complex Litigation, Parts I and II, §§3.11 (rev. ed.
1977).  Additionally, consultation and cooperation between
the two concerned district courts, if viewed appropriate
by those courts, coupled with the cooperation of the parties,
would minimize the possibility of conflicting pretrial
rulings.  See In re Raymond Lee Organization Inc. Securities
Litigation, 446 F. Supp. 1266, 1268 (J.P.M.L. 1978).

IT IS THERFORE ORDERED that the motion pursuant to
28 U.S.C. §1407 to transfer the actions listed on the following
Schedule A be, and the same hereby is, DENIED.

DOCKET NO. 424

SCHEDULE A

DISTRICT OF DELAWARE

Phoenix Canada Oil Company Limited          C.A. No. 76-421
v. Texaco, Inc., et al.

SOUTHERN DISTRICT OF FLORIDA

Norsul Oil & Mining Co., Ltd. v. Texaco     C.A. No. 76-1629-Civ.
Inc., et al.